No. 2013-1021, -1022

IN THE

# United States Court of Appeals
# for the Federal Circuit

———————

ORACLE AMERICA, INC.,

*Plaintiff-Appellant,*

v.

GOOGLE INC.,

*Defendant-Cross Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, CASE NO. 10-CV-3561, HON. WILLIAM H. ALSUP

———————

**BRIEF OF *AMICI CURIAE* PICTURE ARCHIVE COUNCIL OF AMERICA, INC. AND GRAPHIC ARTISTS GUILD IN SUPPORT OF PLAINTIFF-APPELLANT SEEKING REVERSAL**

William A. Rudy
LATHROP & GAGE LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone: (816) 292-2000
Facsimile: (310) 292-2001

Carole E. Handler
John J. Shaeffer
Brianna E. Dahlberg
LATHROP & GAGE LLP
1888 Century Park East, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 789-4600
Facsimile: (310) 789-4601

*Attorneys for Amici Curiae*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for *Amici Curiae* certifies the following:

1.     We represent the Picture Archive Council of America, Inc. and the Graphic Artists Guild.

2.     Those are the real names of the real parties in interest

3.     Neither *Amici Curiae* we represent has any parent corporation. No publicly held company owns ten percent or more of their stock.

4.     The following law firm and partners and associates are expected to appear in this court:

LATHROP & GAGE LLP:

William A. Rudy
Carole E. Handler
Brianna E. Dahlberg

DATED:  February 19, 2013            Respectfully submitted,

s/ William A. Rudy
William A. Rudy
LATHROP & GAGE LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone:  (816) 292-2000
Facsimile:  (310) 292-2001

# TABLE OF CONTENTS

STATEMENT OF THE IDENTITY AND INTERESTS OF *AMICI CURIAE*........1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................4

ARGUMENT ...............................................................................................7

I.  None of the Four Fair Use Factors Supports Google ..........................7

   A.  The First Fair Use Factor, Purpose and Character of the Use, Supports
      Oracle.................................................................................................8

      1.  The Record Demonstrates that Google Acted in Bad Faith ...................8

      2.  Google's Use Was Undoubtedly Commercial......................................13

      3.  There Exist No Countervailing Considerations of
         "Transformative Use" Here ................................................................15

   B.  The Second Fair Use Factor, Nature of the Copyrighted Work, Supports
      Oracle...............................................................................................18

   C.  The Third Fair Use Factor, Amount and Substantiality of the Use, Supports
      Oracle...............................................................................................21

   D.  The Fourth Fair Use Factor, Effect On The Market, Supports Oracle...........23

II.  CONCLUSION..............................................................................27

# TABLE OF AUTHORITIES

## Cases

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP,*
    329 F.3d 923 (7th Cir. 2003) ................................................................20

*Burrow-Giles Lithographic Co. v. Sarony,*
    111 U.S. 53 (1884) ...............................................................................7

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994) ....................................................................... 8, 14

*Castle Rock Entertainment v. Carol Publishing Group,*
    150 F.3d 132 (2d Cir. 1998) .................................................................16

*CDN Inc. v. Kapes,*
    197 F.3d 1256 (9th Cir. 1999) .............................................................21

*Dr.Seuss Enterps. v. Penguin Books USA Inc.,*
    109 F.3d. 1394 (9th Cir. 1997) ...........................................................16

*Fairey v. Associated Press,*
    No. 09-CV-1123 (S.D.N.Y.) .................................................................16

*Feist Publications, Inc. v. Rural Telephone Services, Co.,*
    499 U.S. 340 (1991) ..................................................................... 19, 20

*Gaylord v. United States,*
    595 F.3d 1364 (Fed. Cir. 2010) ..................................................... 16,  24

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
    471 U.S. 539 (1985) ........................................................ 14, 15, 22, 24

*Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.,*
    621 F.2d 57 (2d Cir. 1980) ..................................................................24

*Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters.,*
    945 F.2d 509 (2d Cir. 1991) .................................................................20

*Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*,
    266 F.2d 541 (2d Cir. 1959).................................................................21

*Kregos v. Associated Press*,
    937 F.2d 700 (2d Cir. 1991).................................................................21

*Leadsinger, Inc. v. BMG Music Publ'g*,
    512 F.3d 522 (9th Cir. 2008) ...............................................................16

*Los Angeles News Serv. v. KCAL-TV Channel 9*,
    108 F.3d 1119 (9th Cir. 1997) .............................................................10

*Mattel, Inc. v. Goldberger Doll Mfg. Co.*,
    365 F.3d 133 (2d Cir. 2004)................................................................20

*Mazer v. Stein*,
    347 U.S. 201 (1954).............................................................................4

*Medallic Art Co. Ltd. V. Washington Mint, LLC*,
    208 F.3d 203 (2d Cir. 2000)................................................................20

*Monge v. Maya*,
    688 F.3d 1164 (9th Cir. 2012) .............................................................25

*Oriental Art Printing, Inc. v. Goldstar Printing Corp.*,
    175 F. Supp. 2d 542 (S.D.N.Y. 2001) ................................................21

*Paramount Pictures Corp. v. Carol Pub'g. Group*,
    11 F. Supp. 2d 329 (S.D.N.Y. 1998) ..................................................17

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*,
    No. 96 Civ. 4126, 2000 WL 1028634 (S.D.N.Y. Jul. 25, 2000) ........18

*Prestige Floral S.A. v. California Artificial Flower Co.*,
    201 F. Supp. 287 (S.D.N.Y. 1962) .....................................................21

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992)........................................................ 8, 18

*Salinger v. Colting*,
    641 F. Supp. 2d 250 (S.D.N.Y. 2009), *aff'd* 607 F.3d 68 (2d Cir. 2010)..... 17, 18

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
    81 F.2d 49 (2d Cir. 1936)....................................................................................23

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)...........................................................................................27

*Sony Corp. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)...........................................................................................14

*The Authors Guild v. Google, Inc.*,
    770 F. Supp. 2d 666 (S.D.N.Y. 2011) ............................................................12

*Triad Systems v. Southeastern Express Co.*,
    64 F.3d 1330 (9th Cir. 1995) ..........................................................................17

*Twin Peaks Prods., Inc. v. Publ's Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993)..................................................................... 24, 25

*Ty Inc. v. Publications Intl. Ltd.*,
    333 Fed. Supp. 2d 705 (N. D. Ill. 20014) ......................................................15

*Viacom International Inc. v. YouTube, Inc. et al.*,
    No 07 – CV 2103 ...............................................................................................13

*Wall Data, Inc. v. Los Angeles County Sherriff Dept.*,
    447 F.2d 769 (9th Cir. 2006) ..................................................................... 17, 19

*Warner Bros. Entm't Inc. v. RDR Books*,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................. 17, 18, 25

**Statutes & Other Authorities**

17 U.S.C.§ 107 ...........................................................................................................4

17 U.S.C.§ 106 .........................................................................................................10

U.S. Const., Art. 1, Sec. 8, C1.8 ......................................................................... 4, 27

Carole E. Handler, *The Struggle Over Net Neutrality*,
    25 E-Commerce Law and Strategy 1 (2009) ......................................................12

Eric Schmidt, *Books of Revelation*, Wall St. J., Oct. 18, 2005,
    http://online.wsj.com/article/SB112958982689471238.html .............................12

James Kanter and Steve Lohr, *As Europe Presses Google on Antitrust, U.S. Backs
    Away*, N.Y. Times, Dec. 17, 2012 ......................................................................12

Larry Page, *2012 Update from the CEO*,
    http://investor.google.com/corporate/2012/ceo-letter.html ................................11

Lloyd L. Weinreb, *Fair's Fair: A Comment on the Fair Use Doctrine*,    103
    Harv. L. Rev. 1137, 1138 (1990) ..........................................................................4

Nimmer Para. 13 05 [B] ........................................................................................24

Robert Levine, *Free Ride: How Digital Parasites Are Destroying the Culture
    Business, and How the Culture Business Can Fight Back* 94-95 (2011) ...........13

Roger Cheng, *Google: Alibaba's OS is an incompatible version of Android*,
    CNET News (Sept. 14, 2012), http://news.cnet.com/8301-1035 3-57513559-
    94/google-alibabas-os-is-an-incompatible-version-of-android/ .........................10

The Honorable Pierre Leval, *Commentary: Toward A Fair Use Standard*,
    103 Harv. L. Rev. 1105, 1110 (1990) ...................................................................4

## STATEMENT OF THE IDENTITY AND INTERESTS OF *AMICI CURIAE*

*Amici Curiae* respectfully submit this memorandum supporting Plaintiff-Appellant Oracle and urging reversal of the district court's May 31, 2012 Order.[1]

The Picture Archive Council of America, Inc. ("PACA") is a not-for-profit trade association which represents the interests of entities who license images (still and motion) to editorial and commercial users. Founded in 1951, its membership currently includes over 100 content image libraries globally, including large general libraries and smaller specialty libraries that are engaged in licensing millions of images, illustrations, film clips and other content on behalf of thousands of individual creators.

The Graphic Artists Guild serves illustrators, designers, web creators, production artists, surface designers and other graphic creators on a national basis. Copyright protection of creative works is particularly important to the Guild, as that protection enables its members to support themselves and to create new works for the benefit of the public. The Guild is organized as a union to more effectively represent artists' interests in many areas, including the political arena, ensuring fair treatment at the hands of local, state and federal governments. The Guild works

---

[1] Pursuant to Fed. R. App. P. 29(a) and Federal Circuit Rule 29(c), all parties have consented to the filing of this brief. No person other than *Amici Curiae* or their counsel authored this brief in whole or in part, or made a monetary contribution to its preparation or submission.

closely with the U.S. Copyright Office to ensure that its members have a voice on laws that most affect visual artists and that the important laws protecting their rights remain in force. The Graphic Artists Guild Legal Defense Fund also supports artists involved in precedent-setting legal disputes.

The members of *Amici* depend on the licensing of their photographs and other creative works in order to support themselves. Licensing images for multiple purposes to a rich variety of customers generates revenue that they use to maintain themselves and to support their ongoing activities. By finding elements of Oracle's Java packages uncopyrightable, the district court's opinion evidences little respect for the creativity involved in Oracle's works. Of more immediate concern to *Amici*, however, is that the district court, in denying Oracle's motion for judgment as a matter of law on fair use, failed to appreciate that if Google's actions vis-à-vis Oracle are considered to be fair use, it would undermine copyright protection not only for computer programs but for all creative works. It cannot be a fair use to take the most valuable part of a work – here, the key source code used to create, among other things, applications for mobile devices – and to use it to undermine the market for the original work. Copyright law is intended to respect and incentivize investment in creative works for the benefit of creators and the public. If this Court affirms the holding of the court below, it will open the door to massive infringements of *Amici's* protected expression, threaten the ability of

*Amici's* members to earn a living from their work and limit their ability to bring the benefits of their work to the public.   Ultimately, the *Amici*, all creators, and the public will be harmed.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Copyright law provides incentives for creators such as *Amici* and Oracle to create new works whose intellectual and artistic products benefit the public. Importantly, that law protects their right to profit from their investment. This protection for the results of their efforts reflects the judgment that "encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and investors in 'Science and Useful Arts,'" *Mazer v. Stein*, 347 U.S. 201, 219 (1954); U.S. Const., Art. 1, Sec. 8, C1.8.

Section 107 of the Copyright Act provides a limited "fair use" exception to that right "for purposes such as criticism, comment, new reporting, teaching (including multiple copies for classroom use), scholarship or research." 17 U.S.C. § 107; *see* The Honorable Pierre Leval, *Commentary: Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110 (1990).[2] But fair use, a defense to infringement, was never intended to swallow the statutory grant itself, as the ruling below allows. Were it otherwise, the guarantee of rights afforded copyright holders in Section 106 of the Copyright Act would be meaningless.

---

[2] *See also* Lloyd L. Weinreb, *Fair's Fair: A Comment on the Fair Use Doctrine*, 103 Harv. L. Rev. 1137, 1138 (1990) (fair use is an exemption from copyright infringement for uses that are "fair"). At the time the article was written, Judge Leval was on the District Court. He now serves on the Court of Appeals for the Second Circuit.

The fair use defense was never available to protect the unauthorized copying of the most valuable part of the original work.  Moreover, the creation of a commercial work that incorporates those valuable components in an effort to supersede the original creator is historically not a fair use.  This is particularly so when the copying is used to compete directly with the work of the creator.  Similarly, copying that disrupts an existing licensing program and the market for the original work is also quintessentially unfair.

In other words, fair use is not a free pass for competitors who want to piggyback on the creative works of others to jumpstart their own domination of an emerging and lucrative new field.  No scholar or judge, and, other than Google, no party, has openly or even impliedly taken the position that the function of fair use is to allow a powerful economic competitor brazenly to appropriate another's creative work to accelerate its own entry into an exploding new business.  Yet, when Google decided to appropriate the key components of Java without Oracle's permission, with the clear intent to take advantage of the coalesced community of programmers that had formed around Java, that is precisely what it did.

This Court's ruling directly affects *Amici*.  Individual visual artists and image archives depend on the revenues generated by the licensing or sale of their copyrighted works -- revenue that supports the creation of new works and the maintenance of existing collections.  If creators were unable to generate income in

this manner, it would advance the copyists' interests at the expense of the creators and copyright owners and curtail creation of new works. Yet that is the dangerous consequence of the ruling below.

Adoption of Google's fair use argument in this case would convert fair use from an important shield for legitimate secondary uses into a competitive sword that cuts off the copyright rights of others. There is nothing "fair" about appropriating the copyrighted works of others to leapfrog the arduous requirements of creating one's own code and developing one's own community of programmers. And there is nothing "fair" about fragmenting Oracle's markets and undercutting its compelling and recognizable "write once, run anywhere" philosophy.

*Amici* now request this Court not only to reverse the ruling below on the copyrightability of Oracle's creative work, but also to rule that, as a matter of law, there is no fair use defense to Google's infringement. As members of the photography community, *Amici* are particularly concerned about fair use in the context of misappropriation of creative works by a competitor. Courts have repeatedly held that the fact that the language and expression being appropriated is computer code, not music or poetry, does not mean that the unauthorized taking of it is fair, any more that the fact that subject matter of a photograph is real does not

divest that photograph's copyrighted expression of full protection under the law.[3]

*Amici*, who are photographers and creative artists, have had to fight their own battles for copyright protection for their creative products which uniquely combine artistic expression and factual subject matter, *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884), and they would be immeasurably harmed by a finding of fair use here.  If such takings were called "fair," that decision will inevitably affect all creators.

## **ARGUMENT**

### **I.  NONE OF THE FOUR FAIR USE FACTORS SUPPORTS GOOGLE**

Section 107 of the Copyright Act articulates the primary considerations in analyzing fair use in the form of four factors.  While these factors are often called "non-exclusive," and are not "a score card that promises victory to the winner of the majority," Leval at 1111, they are the most inclusive statement to guide courts in their deliberations.  The four factors are:

(1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

---

[3] The ruling below stands in sharp contrast with the language of the High Court of Justice of the European Union, which observed that ". . . if a third party were to procure part of the source code or the object code relating to the programming language or to the format of data files used in a computer program, and if that party were to create, with the aid of that code, similar elements in its own computer program, that conduct would be liable to constitute partial reproduction within the meaning of Article 4(a) of Directive 91 / 250."  *SAS Institute Inc. v. World Programming Ltd.*, May 2, 2012.

(2)    the nature of the copyrighted work;

(3)    the amount and substantiality of the portion used in relation to the

copyrighted work as a whole; and

(4)    the effect of the use upon the potential market for or value of the

copyrighted work.

## A.    The First Fair Use Factor, Purpose and Character of the Use, Supports Oracle

To ascertain the "purpose and character of the use" under the first factor

requires an analysis of (1) Google's bad faith conduct in using the Java packages,

(2) the commercial nature of Google's use, and (3) the degree to which Google's

use "'merely supersede[s] the objects of the original . . . or instead adds something

new, with a further purpose or different character, altering the first with new

expression, meaning, or message" -- i.e., whether the use is transformative.

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).  All elements of the

first factor favor Oracle.

### 1.    The Record Demonstrates that Google Acted in Bad Faith

Because fair use is an equitable doctrine, the party invoking it must have

acted equitably.  *Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir. 1992).  This

subfactor supports Oracle.  Google requested a license from Oracle because it

wanted to use Oracle's Java packages, showing that Google knew a license was

required.  Google also knew those licenses came with certain conditions.

Specifically, if it took a General Public License (or "GPL") it would need to make any changes available to the open source community, and if it took a Commercial or Specification License, the results of its work would be required to meet Oracle's compatibility requirements to adhere to Java's "write once, run anywhere" principle.   Oracle Br. 14.   Google would not comply with those terms, but it wanted and needed Java.

*First*, Google needed to make rapid entry into the smartphone world. Smartphones and mobile devices were rapidly displacing computers as the best means to search the Internet and Google was not yet a player in that market, let alone dominant, the position it usually enjoys.   *Second*, Google needed a community of programmers immediately available to write popular apps.  Without such a community, Google could not achieve the primacy it sought or even function as a viable competitor in the smartphone market.

As important as these objectives were to Google, and as popular as Android has become, such a commercial business goal, or its successful achievement, does not justify the copying of protected expression.  To allow a highly dominant firm to use another's creative endeavor so as to bring successfully to market a product competitive to the right holder's market has never been the function of fair use. That very concept is inconsistent with the exclusivity of the bundle of rights

granted under 17 U.S.C. § 106 to the rights holder -- an exclusivity which does not envision any such definition of "competition."

Indeed, by making its Java-based Android platform incompatible with the Java platform so that apps written for Android will not work on Java, Google intentionally undermined Oracle's own licensing program.  Oracle Br. 29 (citing A2042-43, 21,504-04).  Google's motive – to profit from the unauthorized use of a work that took substantial effort and millions of dollars to create, displacing the original work – is the essence of bad faith.  "'[T]he propriety of the defendant's conduct' is relevant to the character of the use at least to the extent that it may knowingly have exploited a purloined work for free that could have been obtained for a fee."  *Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997).

Google's bad faith is further underscored by its hypocritical reaction to other companies' attempts to create incompatible versions of Android.  Ironically, when Google's competitor Alibaba created and sold an incompatible version of Android – doing to Google precisely what Google did to Oracle – Google, failing to look into a revealing mirror, threatened to cut off any of its licensees who did business with Alibaba.  *See* Roger Cheng, *Google: Alibaba's OS is an incompatible version of Android*, CNET News (Sept. 14, 2012), http://news.cnet.com/8301-1035 3-57513559-94/google-alibabas-os-is-an-incompatible-version-of-android/.    At the

time Google said in a statement, "Compatibility is at the heart of the Android ecosystem and ensures a consistent experience for developers, manufacturers, and consumers . . . Non-compatible version [sic] of Android, like [Alibaba's platform] Aliyun, weaken the ecosystem." *Id.* Google's statement, however, reveals its Janus-like approach to compatibility, given that it was more than happy to decimate the Java ecosystem, which had existed for decades, in order to create Android.

Indeed, Google has a history of behavior that contradicts its public statements. It is entirely consistent with its history that Google has now sought to vault into first place in the smartphone market by relying on others' creativity. Often purporting to serve the goals of open communication and innovation,[4] as it argues here, Google has been an aggressive entrant in the fields it has entered, whether or not related to its original "search engine" identity,[5] and its efforts to

---

[4] *See* Larry Page, *2012 Update from the CEO*, http://investor.google.com/corporate/2012/ceo-letter.html.

[5] Google has expanded into advertising services, communication and publishing tools, development tools, mapping products (such as Google maps), statistical tools, numerous desktop and mobile web applications (such as Google Chrome, Google Calendar, Gmail), and content provision.

achieve dominance in all its chosen endeavors have hardly gone unnoticed by the antitrust agencies at home and competition commissions abroad.[6]

Google has long been a critic of the so-called "copyright monopoly" and a devoted proponent of its own definition of fair use in almost all circumstances. *See, e.g.,* Eric Schmidt, *Books of Revelation*, Wall St. J., Oct. 18, 2005, http://online.wsj.com/article/SB112958982689471238.html.  In its famous Google Books project, initiated in 2006, and designed to make the copyrighted contents of written works universally available, Google initially argued that the fair use doctrine empowered it to copy the entire contents, whether copyrighted or public domain, of the world's most revered libraries[7] with the laudable objective of facilitating scholarly research and access – a rationale that copyright owners fought bitterly, even while approving the enticing vision of a "new Alexandria."  For several years, as well, Google was a leading proponent of "net neutrality" (a doctrine that gave all transmitted content equal status on the Internet) – until it realized that doctrine could hurt it, and modified its positions.  Handler, *The Struggle Over Net Neutrality*, 25 E-Commerce Law and Strategy 1 (2009).

---

[6] *See* James Kanter and Steve Lohr, *As Europe Presses Google on Antitrust, U.S. Backs Away*, N.Y. Times, Dec. 17, 2012, at B1.

[7] *The Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011).  Google scanned millions of books and other works from the collections of libraries of the University of Oxford, Harvard University, Stanford University, and the New York Public Library, among many others.

In the copyright litigation between Viacom and Google's subsidiary YouTube, Google undoubtedly backed YouTube's business model under which three-quarters or more of its content would consist of others' copyrighted material. Robert Levine, *Free Ride*: *How Digital Parasites Are Destroying the Culture Business, and How the Culture Business Can Fight Back* 94-95 (2011). A YouTube executive even admitted in an email that "if we remove all that content . . . [w]e go from 100,000 view a day down to about 20,000 views or maybe even lower." Viacom's Statement of Undisputed Facts items 56, 104, *Viacom International Inc. v. YouTube, Inc. et al.*, No 07 – CV 2103. Regard for others' copyright ownership has not been one of Google's most vocal priorities.

The commercial success of the copyist, however, does not justify appropriating the intellectual property of others.[8] That fact is true regardless of whether the taking is of computer code, photographs, motion pictures, or any other work protected by copyright.

2.    Google's Use Was Undoubtedly Commercial

The second element of factor one, which considers whether the use was commercial, asks whether a revenue-generating user can and should absorb the costs of complying with copyright law by compensating the original author.

---

[8] This is undoubtedly a complex determination. To quote Shakespeare: "Fair is foul, and foul is fair: Hover through the fog and filthy air."

"[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright. . ."  *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984).  In *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985), the Supreme Court made clear that the key is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  The "commercial" nature of the infringing work has long been a key consideration for deciding the "purpose and character of the use," and whether such use was "fair."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583-84 (1994) (citing *Sony*, 464 U.S. at 451, as applying the presumption that "every commercial use of copyrighted material is presumptively . . . unfair . . .").

There can be no question here -- Google's motives for copying significant elements from the Java packages were undeniably commercial.  Google's counsel conceded that "the fact that it's a commercial use is not in dispute . . .  The evidence is pretty clear that they created it to provide a platform on which other Google product[s] could do better."  Oracle Br. 69-70 (quoting A21,591).  Here, Google's takings, which provided it first, market entry and then, market leadership, and devalued Oracle's preexisting licensing program, brought it generous economic rewards.  Given its success from its infringement, Google is amply able to "pay the customary price."  *Harper & Row*, 471 U.S. at 562.

Google's blatantly commercial competitive objective undermines any claim of fair use. *Rogers*, 960 F.2d at 309 (highly commercial art generating substantial revenue weighed against fair use); *Ty Inc. v. Publications Intl. Ltd.*, 333 Fed. Supp. 2d 705, 711 (N. D. Ill. 20014) (use was commercial where defendant publishing business used plaintiff's photos in books it sold for money "without paying the customary price").[9]

### 3. There Exist No Countervailing Considerations of "Transformative Use" Here

The third subfactor asks whether and to what extent the defendant's use was transformative, that is to say, different in terms of its purpose, meaning, and effect. This issue is of particular concern to *Amici*, as their members' photographic works have at times been stolen by infringers claiming transformative use.[10]  This Court has held that "one must consider whether the new work merely supersedes the objects of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or

---

[9] Google may advance the untenable argument that, because it does not charge users directly, it is not making commercial use of Oracle's intellectual property. But this argument is not credible for several reasons.  First, Google's commercial model depends on targeted advertising, and therefore, a large community of users is essential and serves a significant economic purpose for Google.   With a successful smartphone platform, Google's revenues increased both directly and indirectly through the results of its increased access to consumers via advertising. Second, Google's taking effectively halted its competitor's licensing program. Economic competition is by definition "commercial."

[10] *See*, *e.g.*, *Fairey v. Associated Press*, No. 09-CV-1123 (S.D.N.Y.).

message." *Gaylord v. United States*, 595 F.3d 1364, 1372 (Fed. Cir. 2010) (internal quotation marks omitted) (finding that government's use of Korean War memorial on postage stamp was not a fair use, despite various alterations to the image). "A quotation of copyrighted material that merely repackages or republishes the original is unlikely to past the test . . ." Leval at 1111. Courts have consistently rejected efforts to appropriate the context and luster of popular copyrighted works by changes that do not use the material in a different manner or for a different purpose. *See*, *e.g.*, *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) (as amended) (karaoke machine is superseding and not fair use); *Castle Rock Entertainment v. Carol Publishing Group*, 150 F.3d 132 (2d Cir. 1998) (creation of "Seinfeld Aptitude Test" based on popular television program simply restructured existing material but did not transform); *Dr.Seuss Enterps. v. Penguin Books USA Inc.*, 109 F.3d. 1394, 1399-1401 (9th Cir. 1997) (mimicking Dr. Seuss style to write about the O.J. Simpson murder was not transformative); *Salinger v. Colting*, 641 F. Supp. 2d 250 (S.D.N.Y. 2009), *aff'd* 607 F.3d 68 (2d Cir. 2010) (merely aging an iconic hero sixty years was not transformation); *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513 (S.D.N.Y. 2008) ("Lexicon" of supplemental works copied but did not transform).

Here, Google did nothing to transform the Java packages. Its purpose was exactly the same as Oracle's – to call upon the Java packages' library of prewritten

source code – and to perform identical functions as in Java, using identical names and structure that were so familiar to Java application programmers. This is copying, and whether of television programming, literary style, or code, it is not a transformative use. *Wall Data, Inc. v. Los Angeles County Sherriff Dept.*, 447 F.2d 769 (9th Cir. 2006) (rejecting fair use where defendant created identical copies of software); *Triad Systems v. Southeastern Express Co.*, 64 F.3d 1330, 1337 (9th Cir. 1995) (rejecting fair use defense where defendant "is simply commandeering its customers' software and using it for the very purpose for which, and in precisely the same manner in which, it was designed to be used.").

It has never been a transformative use to copy someone's work verbatim and intersperse it with other material. *See Paramount Pictures Corp. v. Carol Pub'g. Group*, 11 F. Supp. 2d 329, 335 (S.D.N.Y. 1998) ("It simply cannot be the case that an illicit copying can be protected by being placed in the midst of segments that do not infringe."); *see also Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, No. 96 Civ. 4126, 2000 WL 1028634, at *18 (S.D.N.Y. Jul. 25, 2000) ("[J]uxtaposing text wedged between two non-infringing sections of the secondary work does not constitute fair use." (internal quotation marks omitted)). The fact that this case involves programming, not literature or motion pictures, does not change the analysis. Such a subterfuge does not shield the nature of Google's conduct. Google did not add anything new – it used Java

norms as Java had, and its excuse, that the implementing code was paraphrased, does not make what it did transformative.  Google simply incorporated its stolen expression into a competitive device, ignoring that Oracle was already in the mobile market with licenses to RIM, Nokia, and others.  The only transformation here was a revenue shift, engineered by Google.[11]  Accordingly, this factor favors Oracle.

### B.    The Second Fair Use Factor, Nature of the Copyrighted Work, Supports Oracle

The second factor also favors Oracle because the Java packages were the product of substantial creative effort.  *Rogers*, 960 F.2d at 304.  This issue, too, is particularly important to *Amici*, given that their members' work is the product of substantial creative effort that is sometimes overlooked.  Courts recognize that the temporal and financial investment involved in the creation of source code weighs against a finding of fair use.  *Wall Data,* 447 F.2d at 780.  The Java packages are creative works deserving of copyright protection.  The court below recognized their creativity.  Order at 37.  The creation of the Java packages at issue involved far more than rote compilation of data, or the "thin" creativity involved in the selection and arrangement of information in compilations which the Supreme

---

[11] Even if Google's use were found to be transformative, which is unlikely, its use still may be unfair if the other factors weigh against it – as they undoubtedly do here.  *Salinger*, 641 F. Supp. 2d 250; *RDR Books*, 575 F. Supp. 2d 513.

Court held was nonetheless protected in *Feist Publications, Inc. v. Rural Telephone Services, Co*., 499 U.S. 340, 359 (1991). The Java packages are protectable because they are the product of expressive design choices by the developers who created them, not merely because they are the product of substantial investment of labor and resources.

As Reinhold, the Chief Architect of the Java Platform Group, explained in his testimony, a programmer may write a package that performs an identical function to another package, using very different forms of expression. For instance, Java's logging package for banking transactions performs exactly the same function as a competing package created by developers outside of Sun called "Log4J", but "They have different class names, different method names, different interfaces, and different relationships." A800-801 (RT 631:11-632:18). The form of the work is not dictated by its function, but is the product of expressive design choices by the developers.

Indeed, Reinhold testified that his work in designing the Java packages was "absolutely" creative because "there are so many choices to be made I wouldn't know how to start counting them." A796-97 (RT 627:22-628:1).

> But it's not just about the names.  It's also about the structure.  You know, how should classes be organized under other classes?  How should interfaces be organized under other classes?  How should interfaces be organized under other interfaces?  How should classes and interfaces relate?  Where should the methods be?  What should the methods be named?  What kinds of inputs do the methods take?  What kind of outputs do the methods provide for the fields?  How do with they relate?  Is the value in a field a color, or is it just a number, or is it a string, or is it something else?  So there are many, many design choices to be made.

A797-98 (RT 628:22-629:6).  The work of Java "architects" like Reinhold more than meets the standard of original authorship required for copyright protection. *See Feist*, 499 U.S. at 345 (a work is "original" if it "possesses some minimal degree of creativity"; "The vast majority of works make the grade quite easily, as they possess some creative spark."); *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135 (2d Cir. 2004) (Barbie faces held protectable); *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923 (7th Cir. 2003) (housing grant applicant forms); *Medallic Art Co. Ltd. V. Washington Mint, LLC*, 208 F.3d 203 (2d Cir. 2000) (three-dimensional reproductions of U.S. Treasury notes); *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters.*, 945 F.2d 509, 514 (2d Cir. 1991) (Chinese yellow pages held protectable); *CDN Inc. v. Kapes*, 197 F.3d 1256, 1257-58, 1260-61 (9th Cir. 1999) (estimates of coin values); *Kregos v. Associated Press*, 937 F.2d 700, 702, 704 (2d Cir. 1991) (pitcher's statistics); *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 545 (2d Cir. 1959) (cake box label); *Oriental Art*

*Printing, Inc. v. Goldstar Printing Corp.*, 175 F. Supp. 2d 542, 548 (S.D.N.Y. 2001) (Chinese menu); *Prestige Floral S.A. v. California Artificial Flower Co.*, 201 F. Supp. 287 (S.D.N.Y. 1962) (plastic flowers). The creative work that has been stolen here well exceeds the Copyright Act's minimal requirements.

The court below, although admitting that the Java packages were creative and original, Order at 37, mischaracterized the nature of the Java packages, treating them as purely functional. In essence, it confused the copyrightable source code instructing a computer how to perform a function with the method by which that function is performed. Order at 35. No one disagrees that Google was free to write its own implementing code to carry out the same functions as the Java packages, but Google cannot copy Oracle's particular creative *expressions* of those functions – embodied in the Java Packages – as a shortcut around creating its own original expressions of those functions. Accordingly, this factor favors Oracle.

### C.    The Third Fair Use Factor, Amount and Substantiality of the Use, Supports Oracle

The third factor considers the degree and centrality of the original copied in relation to the work's whole. Even copying a small amount from a work can be problematic and unfair if what is copied is the "heart of the work." *Harper & Row*, 471 U.S. at 565-566. In *Harper & Row*, the Nation had copied 300-400 words of the original work. They were "'the heart of the book,'" because "they qualitatively embodied Ford's distinctive expression." *Id*. at 564-65. The infringing work was

"structured around the quoted excerpts which serve as its dramatic focal points." *Id.* at 566.  The Court there held that this third factor did not support the infringer because the copying fragmented and devalued the original work by appropriating its focal points.  *Id.* at 566.

Google's copying here was far more extensive than that of The Nation in *Harper & Row*.  Here, the copying is even more destructive because Google went even further.  It appropriated 7,000 lines of source code that "embodied" Oracle's "distinctive expression," when it copied the declaring code, so familiar to programmers, and the heart of what the programming community sought.  Google not only copied the structural norms or rules; it copied *verbatim* Java's expression of this structure.  Having taken the heart, it transplanted the entire circulatory system.

The fact is, as Oracle explained in its opening brief, "Google cherry-picked 'the good stuff from Java,'" — "the 37 packages that it 'believed Java [programmers] would want to find . . . in the new Android system callable by the same names as used in Java." Oracle Br. 20–21 (citing A5874, A135).  And, once the declaring code had been copied (what Google took), the process of writing the different implementing code was trivial.

Google cannot defend itself by claiming that the 7,000 lines of code comprised a relatively small amount compared with the whole.  The effect of what

was taken permeated the entire program.  Moreover, an infringer cannot defend its

taking by pointing to the volume that it did not copy.  As Judge Hand wrote so

eloquently long ago, "no plagiarist can excuse the wrong by showing how much of

the work he did not pirate."  *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d

49, 56 (2d Cir. 1936).  Accordingly, this factor, as well, favors Oracle.

### D.  The Fourth Fair Use Factor, Effect On The Market, Supports Oracle

The fourth fair use factor also favors Oracle.  This factor recognizes that our

intellectual property laws protect copyright owners whose grant allows them to

exploit their exclusive rights under Section 106 of the Copyright Act.  The fourth

factor expresses the philosophy that even in a free enterprise economy, the market

for the exploitation of a copyrighted work is a legitimate element of the copyright

holder's bundle of exclusive rights.  *Amici* depend on that right which allows them

to enrich the public by creating new work.

In analyzing this factor the court considers (1) the harm to the market for the

original work, (2) the harm to the market for derivative works, and (3) harm to the

copyright owner, if the challenged use were to become widespread.  *Gaylord*, 595

F.3d at 1375.  "One need only show that if the challenged use 'should become

widespread, it would adversely affect the *potential* market for the copyrighted

work.'"  *Harper & Row*, 471 U.S. at 568; *Twin Peaks Prods., Inc. v. Publ's Int'l,*

*Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993) (court must consider market for

derivative works); s*ee Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.*, 621 F.2d 57 (2d Cir. 1980); 3 Nimmer Para. 13 05 [B] at 13-77 – 13-78 ("if the defendant's worth adversely affects any of the rights in the copyrighted work . . . the use is not fair.").

*Harper & Row* emphasized that right, noting that "a fair use doctrine that permits extensive prepublication quotations from an unreleased manuscript without the copyright owner's consent poses substantial potential for damage to the marketability of first serialization rights in general."  Similarly, a fair use doctrine that allows the appropriation of protected expression in the name of enhancing a competitor's economic standing poses the same danger.  To the extent that Android here superseded the original work and its derivatives, it has destroyed Oracle's market.

All three types of harm are present here, and if allowed legitimacy, they present a risk to all copyright owners.  First, when Google copied the Java packages and released Android as a free platform, it stalled Oracle's derivative smartphone market.  When a party is "undisputedly in the business of selling [the work] and they have done so in the past" it "unequivocally demonstrates a market for [the work]."  *Monge v. Maya*, 688 F.3d 1164, 1181 (9th Cir. 2012).  When Google gave away the work for free, "the demand for the work in the actual market

. . . drop[ped] significantly." *Id*. at 1181-1182.  To quote Oracle's president, "It's pretty hard to compete with free."  Oracle Br. 77 (quoting A22,498).

Second, Google's release of Android for free eviscerated Oracle's ability to derive revenue from the smartphone market by licensing a mobile version of Java.  By copying the Java packages, Google was able to provide an environment already familiar to programmers – i.e., the Java environment – without licensing fees.  This harm to the market is actionable.  *Twin Peaks Prods.*, 996 F.2d at 1377 (rejecting fair use defense where book about plaintiff's television series may interfere with primary market for television series and "almost certainly interferes with legitimate markets for derivative works."); *RDR Books*, 575 F. Supp. 2d at 540 (affirmed defendant's guide to Harry Potter books harmed market for derivative works).

As for the third element, Oracle invested significant time and resources to develop Java.  It has tried to recoup that investment through its licensing scheme, as Section 106 of the Copyright Act endorses.  If Google's copying is blessed by this Court, continued copying will be permitted to further undermine Oracle's licensing program.  Android, undeniably a market leader, has harmed Oracle's valuable market for "derivative works" based on the copyrighted work, a cognizable harm recognized in case after case.  Google wanted to compete in the smartphone market and took steps to position itself to do so, by copying Oracle's

expression. Google's appropriation here goes to the very heart of the statutory grant and is entirely unfair.

Of prime importance to Google when it targeted Java was the ability to take advantage of the coalesced community of programmers that had formed around the Java and the stolen intellectual property. But a copyist's business goals have never merited a fair use defense. While Google describes this as "fostering innovation" by creating a new platform, this innovation primarily benefited Google's competitive interests and pales besides Oracle's original innovation. Google's appropriation of Oracle's protected, creative work converts fair use from an exception for legitimate second uses into a free-for-all contest with no rules. There is nothing fair about it.

While Google may contend that its policies will not have a negative impact on the market for the works it appropriates, if this Court were to permit unfettered use of such works, without permission, by companies like Google, or indeed anyone else who decides to use a work without permission or paying to take a license, it would assuredly threaten harm to all creators, including not only Oracle but also *Amici*'s members, who depend on licensing revenue to support their ongoing creative endeavors.

The most pernicious aspect of Google's conduct is not simply its taking and commercial exploitation of Oracle's property – it is the fragmenting of Oracle's

market and damage to its unique "write once, run anywhere" principle. That impact goes well beyond Android and is fundamental to Oracle's entire business. Far from fostering interoperability, or contributing to enhanced interoperability, Google's conduct reveals an economically selfish business model that "talks the talk" and stops there. Despite its taking of Java, incredibly, Google created a platform that is not compatible or interoperable with Java, fragmenting Oracle's market and mocking its well-known philosophy.

## II.  <u>CONCLUSION</u>

Copyright law is intended to provide incentives to the copyright holder to enhance the public good to promote the "Progress of Science and the Useful Arts". *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984); U.S. Const., Article I, Sec. 8, Cl. 8. For Google's copying to be fair use would be a perversion of the fair use doctrine and undermine the constitutionally based incentive. There is nothing "fair" about appropriating the copyrighted works of others to leapfrog the effort necessary to create one's own code and develop one's own community of programmers. There is nothing "fair" about confusing protectable expression with structural norms that all may use. And there is nothing "fair" about doing this in a way that "weakens the ecosystem," as Google itself stated to Alibaba, to protect its own interests.

27

Copyright law protects creators and benefits the public by the incentives it provides. Sweeping away those incentives will not only undercut the ability of creators like *Amici* to enjoy the benefit of their own works and create more, but will also harm the public at large which is enriched by those works. This Court should rule as a matter of law that the fair use defense does not apply here.

DATED: February 19, 2013       Respectfully submitted,

s/ William A. Rudy
William A. Rudy
LATHROP & GAGE LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone: (816) 292-2000
Facsimile: (310) 292-2001

Counsel for *Amici Curiae* PICTURE
ARCHIVE COUNCIL OF AMERICA,
INC. and GRAPHIC ARTISTS GUILD

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2013, I caused the foregoing Brief of

*Amici Curiae* Picture Archive Council of America, Inc. and the Graphic Artists

Guild to be electronically filed with the Clerk of the Court using CM/ECF, which

will automatically send email notification of such filing to the following counsel of

record:

Christa M. Anderson
Robert A. Van Nest
Steven Hirsch
Michael Kwun
Dan Jackson
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, CA 94111


Dorian E. Daley
Deborah K. Miller
Matthew Sarboraria
Andrew C. Temkin
ORACLE AMERICA, INC.
500 Oracle Parkway
Redwood Shores, CA 94065


Annette L. Hurst
Gabriel M. Ramsey
Elizabeth C. McBride
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105-2669

E. Joshua Rosenkranz
Mark S. Davies
Andrew D. Silverman
Kelly M. Daley
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

Dale M. Cendali
Diana M. Torres
Sean B. Fernandes
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

DATED:  February 19, 2013          Respectfully submitted,

s/ William A. Rudy
William A. Rudy
LATHROP & GAGE LLP
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone:  (816) 292-2000
Facsimile:  (310) 292-2001

Counsel for *Amici Curiae* PICTURE
ARCHIVE COUNCIL OF AMERICA,
INC. and GRAPHIC ARTISTS GUILD

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that Pursuant to Rules 29(d) and 32(a)(7) of the Federal Rules of Appellate Procedure and of Federal Circuit Rule 32(b), the enclosed brief complies with the length limits set forth at Federal Rule of Appellate Procedure 29(d).  The brief's type size and type face comply with Federal Rule of Appellate Procedure 32(a)(5) and (6).  According to the word processing system used to prepare this brief (Microsoft Word 2010), the word count of the brief is 6,390 words not including the certificate of interest, corporate disclosure statement, table of contents, table of authorities, any addendum containing statutes, rules or regulations, and any certificates of counsel.

DATED:  February 19, 2013         Respectfully submitted,

                                  s/ William A. Rudy
                                  William A. Rudy
                                  LATHROP & GAGE LLP
                                  2345 Grand Blvd., Suite 2200
                                  Kansas City, MO 64108
                                  Telephone:  (816) 292-2000
                                  Facsimile:  (310) 292-2001

                                  Counsel for *Amici Curiae* PICTURE
                                  ARCHIVE COUNCIL OF AMERICA,
                                  INC. and GRAPHIC ARTISTS GUILD